UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

AMTEC INTERNATIONAL OF NY CORP.,

                        Plaintiff,

v.

POLISH FOLKLORE IMPORT CO., INC.,

                        Defendant.

**MEMORANDUM AND ORDER**
20-CV-3 (LDH)(PK)

---

LaSHANN DeARCY HALL, United States District Judge:

Amtec International of N.Y. Corp. ("Plaintiff") brings the instant action against Polish Folklore Import Co., Inc. ("Defendant"), asserting violations of New York's Alcoholic Beverage Control Law ("ABC") § 55-c and New Jersey's Malt Beverage Practices Act. Defendant moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint in its entirety.

## BACKGROUND[1]

Plaintiff is a multi-brand distributor and importer of alcoholic and beverage products in New York, New Jersey, and Connecticut. (Compl. ¶¶ 1–2, ECF No. 1-2.) On or about January 11, 1998, Plaintiff entered into an "Import and Wholesale Agreement" (the "1998 Agreement") with Browar Dojlidy ("Dojlidy"). (*Id.* ¶ 7.) Pursuant to the 1998 Agreement, Dojlidy appointed Plaintiff as the sole importer and distributor of five of its products, including the Zubr brand ("Zubr"), in New York, Connecticut, New Jersey, Illinois, and Pennsylvania. (*Id.*) Shortly thereafter, on February 5, 1998, Dojlidy issued an appointment letter (the "1998 Appointment Letter"), designating Plaintiff as its brand agent for Zubr in New York, New Jersey, Connecticut, Illinois, Michigan, Wisconsin, Massachusetts, Maryland, Delaware, and Pennsylvania. (*Id.* ¶ 8.)

---

[1] The following facts are taken from the complaint and are assumed to be true for purposes of the instant motion.

Between February and March 1998, Amtec was registered as the exclusive distributor for Zubr in New Jersey, Connecticut, and New York, and thereafter, Amtec commenced exclusive distribution of Zubr in those states. (*Id*. ¶¶ 9–12.)

Approximately two years later, on or about December 31, 2000, Dojlidy entered into a new distribution agreement (the "2000 Agreement") with Plaintiff for the distribution of its product in New York, Connecticut, New Jersey, Illinois, and Pennsylvania. (*Id.* ¶ 13.) The 2000 Agreement contained a "choice of law" provision that indicated "[t]his Contract shall be governed by the laws of Poland, in particular[] by the provisions of the Polish Civil Code." (Def.'s Mem. L. Supp. Mot. Dismiss ("Def.'s Mem."), Ex. 2 (2000 Agreement) at 6, ECF No. 15-2.)[2] The 2000 Agreement also contained a durational term, which indicated it would remain in effect until December 31, 2002, "with the possibility of extension," but also included that both parties had the right to "terminate [the] Contract at any time, subject to a three (3) month period of notice" with certain notice requirements. (*Id*. at 5.)

On February 4, 2003, Kompania Piwoarska ("KP") purchased the Dojlidy brewery and acquired the rights to manufacture Zubr. (Compl. ¶¶ 5, 15.) On or about April 24, 2003, Dojlidy issued a new appointment letter to Plaintiff (the "2003 Appointment Letter") for several of its brands, including Zubr, for distribution in New York, New Jersey, Illinois, Michigan, Arizona, California, Connecticut, Florida, Georgia, Maryland, Nevada, Pennsylvania, Rhode Island, and Washington. (*Id*. ¶ 14; Def.'s Reply Mem. L. Supp. Mot. Dismiss, Ex. 6 ("2003 Appointment Letter"), ECF No. 15-11.)[3]

---

[2] The 2000 Agreement referenced herein was not attached to the complaint but is incorporated by reference. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) ("[A] district court must limit itself to the facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference.")
[3] The 2003 Agreement is also incorporated by reference.

2

Following KP's 2003 purchase of Dojlidy, Plaintiff continued to order Zubr through at least September 2003 for distribution in New York, New Jersey, and Connecticut. (Compl. ¶ 16.) For example, in 2004, Plaintiff sold approximately $165,000 of Zubr in New York and $187,000 in New Jersey, respectively. (*Id*. ¶ 17.) However, according to the complaint, KP "temporarily withdrew" Zubr from the United States market in August 2005 and remained outside of the United States through 2018. (*Id*. ¶¶ 18, 20.) On or around April 11, 2018, Defendant, an "importer of various brands of beer manufactured by [KP]," submitted an "Application for Certificate of Label Approval" to the U.S. Department of Treasury, Alcohol and Tobacco Tax and Trade Bureau to begin the process of recommencing the import of Zubr into the United States market. (*Id*. ¶¶ 4, 22.) In or around September 2018, Defendant attempted to terminate Plaintiff's exclusive distribution rights for Zubr in Connecticut by providing a "formal notice of termination to [Plaintiff] regarding its distribution rights for Zubr" and selling Zubr to a new distributor, Arko. (*Id*. ¶¶ 23, 26.) However, this attempt was unsuccessful. (*Id*. ¶ 24.) On September 24, 2019, the State of Connecticut, Department of Consumer Protection issued a Memorandum of Decision finding that:

> (i) Even though KP had withdrawn Zubr from the United States market in 2005, [Plaintiff] had not relinquished its distribution rights; (ii) [the] Zubr Brand product distributed by [Plaintiff] was the same as that imported by [Defendant]; and (iii) [Defendant] did not have just and sufficient cause to terminate [Plaintiff's] exclusive distribution rights for the Zubr Brand in the State of Connecticut.

(*Id*. ¶ 24.) Thus, Plaintiff remained the "duly registered distributor" of Zubr in Connecticut. (*Id*.) And, in September 2018, Defendant terminated Plaintiff's distribution rights in New York and New Jersey by appointing two new exclusive distributors for Zubr. (*Id*. ¶ 25.) Defendant did not provide a formal notice of termination to Plaintiff. (*Id*. ¶ 26.)

3

**STANDARD OF REVIEW**

To withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of a defendant's liability for the alleged misconduct. *Id*. While this standard requires more than a "sheer possibility" of a defendant's liability, *id*., "[i]t is not the Court's function to weigh the evidence that might be presented at trial" on a motion to dismiss, *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999). Instead, "the Court must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the Court must accept the factual allegations of the complaint as true." *Id*. (citations omitted).

**DISCUSSION**

**I.   The New York and New Jersey Distributor Statutes**

New York and New Jersey, "like many other states, [have] statutorily mandated a three-tier system for the distribution of beer." *See John G. Ryan, Inc. v. Molson USA, LLC*, No. 05CV3984, 2005 WL 2977767, at *3 (E.D.N.Y. 2005) (discussing New York statute); N.J. STAT. ANN. § 33:1-93.13(b) ("It is appropriate to recognize the guiding characteristics regarding the distribution of malt alcoholic beverages . . . to maintain the three-tier distribution system[.]"). Within this tiered-system, beer suppliers or brewers occupy the top level, distributors or wholesalers occupy the middle level, and local retailers make up the bottom tier. *Molson*, 2005 WL 2977767, at *3. Often, brewers selling beer in New York and New Jersey grant distributors exclusive distribution rights in a given territory, and "[a]s a result, distributors in a given territory

tend to become associated with the brands they distribute." *Id.* (discussing New York statute). Given this dynamic, the laws governing the relationship between a brewer and a wholesaler, seek to "level the playing field" by providing protections to beer wholesalers. *See S. End Distrib. Corp. v. Hornell Brewing Co.*, 685 N.Y.S.2d 594, 598 (Sup. Ct. 1999) (quoting Governor's Mem. approving L.1996, ch. 679, 1996 McKinney's Session Laws of N.Y., at 1927); N.J. STAT. ANN. § 33:1-93.13(c) ("It is . . . fitting and proper to regulate the business relationship between brewers and wholesalers of malt alcoholic beverages . . . to further the public policy of [New Jersey] and protect beer wholesalers from unreasonable demands and requirements by brewers . . . ."); *see also* N.Y. ALCO. BEV. CONT. LAW § 55-c(1) ("ABC") ("[T]he regulation of business relations between brewers and beer wholesalers is necessary and appropriate to the general economy and tax base of [New York] and in the public interest."). Indeed, "[a]bsent statutory protection, brewers could arbitrarily wipe out investments made by wholesalers" to distribute beer and build relationships with brands. *Amtec Int'l of N.Y. Corp. v. Beverage All. LLC*, No. 10-CV-1147, 2011 WL 13244183, at *2 (E.D.N.Y. Feb. 1, 2011).

### A. New York's Alcoholic Beverage Control Law

In New York, the Alcoholic Beverage Control Law (the "ABC") governs the relationship between brewers and wholesalers. Relevant here, ABC § 55-c outlines the requirements for "[a]greements between brewers and beer wholesalers." ABC § 55-c. Generally, the law requires that distribution agreements be in writing and prohibits the termination and material modification of such agreements without "good cause." *Id.* § 55-c(3). "Good cause" termination and modification of an agreement is limited to two instances: "(i) the implementation by a brewer of a national or regional policy of consolidation that is reasonable, nondiscriminatory, and essential, and (ii) the failure to comply with a material term of the distribution agreement after notice and

5

an opportunity to cure." *Molson*, No. 05CV3984, 2005 WL 2977767, at *4 (citing ABC § 55-c(2)(e)).  However, a brewer or wholesaler may also terminate or otherwise modify an agreement if either party "takes any action which would provide grounds for immediate termination pursuant to the reasonable terms of a written enforceable agreement between them," or "in the event the brewer and beer wholesaler voluntarily agree in writing to terminate the agreement." ABC § 55-c(5)(d)(v)–(vi).  In addition, under Section 55-c(6):

> If a brewer fails to comply with the provisions of this section, a beer wholesaler may maintain a civil action in a court of competent jurisdiction within this state for damages sustained in accordance with the laws of this state which shall govern all disputes arising under an agreement or by reason of its making and performance.

*Id.* § 55-c(6).  While "the brewer has the burden of proving that its action was based upon good cause" in legal actions challenging termination, "the wholesaler retains the burden of proof in all other respects." *S. End Distrib. Corp.*, 685 N.Y.S.2d at 596.

### B. New Jersey's Malt Beverages Practices Act

New Jersey's Malt Beverages Practices Act (the "MBPA") also "protect[s] beer wholesalers from unreasonable demands and requirements by brewers." N.J. STAT. ANN. § 33:1–93.13(c).  Like the ABC, the MBPA prohibits a brewer from terminating any "contract, agreement or relationship with a wholesaler" unless the brewer establishes that it has "good cause" and acted in "good faith," which is implicit in New Jersey contract law.  *See id.* § 33:1-93.15(c)(1), (c)(11).  A party has "good cause" to act when the other fails "to substantially comply with reasonable terms contained in [the] contract or agreement . . . ." *Id.* § 33:1-93.14. For "successor brewers," or "any person, not under common control with the predecessor brewer, who by any means . . . acquires the business or malt alcoholic beverage brands of another brewer, or otherwise succeeds to a brewer's interest with respect to any malt alcoholic beverage brands," the MBPA also provides:

6

> It shall not be a violation of this act for a successor brewer to . . . terminate, in whole or in part, . . . the contract, agreement, or relationship with a wholesaler of the brewer it succeeded, for the purpose of transferring the distribution rights in the wholesaler's territory for the malt alcoholic beverage brands to which the successor brewer succeeded . . . provided that the successor brewer or the second wholesaler . . . first pays to the first wholesaler the fair market value of the first wholesaler's business with respect to the terminated brand . . . .

*Id.* §§ 33:1-93.14, -93.15(d)(1). The MBPA creates a cause of action for any wholesaler to bring suit against a brewer "for violation of [the MBPA], or against a successor brewer in connection with a termination pursuant to [§ 33:1-93.15(d)(1)] of this act[.]" *Id.* § 33:1-93.18(a).

## II. Defendant's Arguments for Dismissal

In its motion to dismiss, Defendant raises several grounds—both procedural and substantive—as the basis for dismissal of the complaint. Specifically, Defendant argues: (1) Plaintiff's claims are time-barred by a statute-of-limitations period that "expired no later than 2011;" (2) New Jersey's MBPA does not retroactively apply to the 2000 Agreement or the 2003 Appointment Letter; (3) neither New York or New Jersey's distributor statutes apply to Defendant because Amtec has not pleaded purchases of title transfer within either state; (4) the 2000 Agreement is solely governed by Polish Law due to the choice-of-law provision; and, (5) the 2000 Agreement expired on its terms. (*See generally* Def.'s Mem. at 5–15, ECF No. 15.) The Court addresses each of Defendant's arguments in turn.

### A. Applicable Statutes of Limitations

Defendant argues that Plaintiff's claims brought pursuant to the New York and New Jersey beer franchise laws are time-barred by the applicable statute of limitations. (Def.'s Mem. at 6–8.) Specifically, Defendant maintains that the alleged temporary withdraw of Zubr from the

7

United States market in 2005 was tantamount to a termination of the agreement under the ABC and MBPA statutes. (*Id.*) The Court disagrees.

As both parties appear to acknowledge, there is no statutory limitations period specified for claims brought under the ABC or the MBPA. Instead, the Defendant argues a three-year statute of limitations applies as, under New York law, "an action to recover upon a liability . . . created or imposed by statute" must be commenced within three years of the cause of action. (Def.'s Mem. at 6 (quoting N.Y. C.P.L.R. § 214(2)). As to the New Jersey statute, Defendant argues that New Jersey's six-year statute of limitations for contract actions applies to actions brought pursuant to the MBPA. (*Id.* (citing N.J. STAT. ANN. § 2A:14-1 ("an action "for recovery upon a contractual claim or liability, express or implied . . . shall be commenced within 6 years" from the time the cause of action accrued)).).

Ultimately, however, the Court need not decide which statute of limitations period applies, as Defendant has failed to establish that the statute of limitations began to accrue, as it maintains, when KP withdrew Zubr from the United States. Specifically, Plaintiff brings its claims under ABC § 55-c and the MBPA, both of which prohibit a brewer from terminating a lawfully appointed distributor except for "good cause." Terminating a lawfully appointed distributor without good cause, therefore, constitutes a statutory violation that would trigger the applicable statute of limitations period. Defendant does not direct the Court to any statutory language, which supports its proposition that Zubr's temporary withdrawal from the United States market constituted an impermissible termination, such that any statute of limitations period was triggered.

Defendant argues *Biotronik, A.G. v. Conor Medsystems Ireland, Ltd.*, 939 N.Y.S.2d 739, 2011 WL 5385980 (Table) (Sup. Ct. Oct. 19, 2011), stands for the proposition that "[t]he

8

'temporary withdrawal' of a product subject to an exclusive distributorship agreement constitutes a breach of contract." (Def.'s Mem. at 7.) Not so. *First*, as Plaintiff argues, *Biotronik* "concerns issues of contractual interpretation when a product was permanently . . . withdrawn from the market . . .." (Pl.'s Opp'n Def.'s Mot. Dismiss ("Pl.'s Opp'n") at 7, ECF No. 15-7).[4] Here, Plaintiff alleges only an alleged "temporary" withdrawal of the product from the distributor's territory in 2005. Moreover, in this case, Plaintiff has not alleged a contractual breach; instead, Plaintiff alleges a statutory violation. (Compl. ¶¶ 18, 54–55, 60–61.) *Second*, even assuming *Biotronik* was factually analogous, it would not change the Court's conclusion. That is, the *Biotronik* court did not reach the conclusion Defendant suggests. Rather, the court determined that "[t]he disputed issues of fact presented on this application forecloses [it] from ruling, as a matter of law, that [the defendant] did not breach the [d]istribution [a]greement when it withdrew [the product] from the market . . . ." *Biotronik*, 939 N.Y.S.2d 739, 2011 WL 5385980 (Table), at *22.

---

[4] Defendants' only cited authority, *Biotronik*, is factually inapposite and does not convince the Court that the statute of limitations began to accrue when KP withdrew Zubr from the United States. In *Biotronik*, the defendant moved for summary judgment seeking to dismiss the action brought pursuant to a distribution agreement. 939 N.Y.S.2d 739, 2011 WL 5385980, at *1 (Table) (Sup. Ct. Oct. 19, 2011). There, the distribution agreement provided that the plaintiff would be the exclusive distributor of a "novel drug-eluting stent." *Id*. Further, the defendant was required to give the plaintiff 12 months' advance notice of a decision to discontinue manufacturing the stent and the right to continue placing orders for those 12 months. *Id*. The agreement also gave the defendant the exclusive right and obligation to issue recalls, safety alerts, or other similar remedial actions. *Id.* at *2. The agreement "recite[d] that European regulatory approval [was] the essence of the agreement." *Id*. Thus, if a clinical trial revealed efficacy or safety issues, "the parties would negotiate in good faith to reduce the minimum quantities [the plaintiff] was otherwise obliged to purchase." *Id*. After a clinical trial that "did not identify safety issues," the defendant announced that it was "terminating its application for FDA approval and withdrawing [its product] from the markets where it had been approved for sale." *Id*. at *2. The plaintiff argued that "there were no safety or health concerns underlying the decision to" withdraw the product and alleged that the defendant breached the distribution agreement through its "sham recall." *Id*. One of the issues before the court was whether the defendant's withdrawal of the product from the market was a recall or a discontinuance under the agreement. The court held that the terms governing a discontinuance could very well apply to a recall that involves a permanent withdrawal from the market. *Id*. at *5. Recognizing that the meaning of the word recall as used in the agreement was ambiguous, the court denied defendant's motion for summary judgment, and further explained that because disputed issues of fact remained, the Court could not foreclose, as a matter of law, that the defendant did not breach the distribution agreement. *Id*. at *9–11.

9

Further, to the extent Defendant directs the Court to documentary evidence, including email communications between Plaintiff and KP that purportedly establishes that KP repudiated the 2000 Agreement, such evidence cannot properly be considered at this stage as it is not incorporated into the complaint by reference, nor judicially noticeable. *See Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider only the facts alleged in the pleadings, documents attached ... or incorporated by reference in the pleadings, and matters of which judicial notice may be taken." (internal quotation marks and alteration omitted)).

Accordingly, Defendant's motion to dismiss the claims as time-barred fails.

### B. Retroactive Application of the MBPA

Defendant argues that New Jersey's MBPA does not apply, as it post-dates Amtec's agreement with Dojlidy and Amtec's last purchases of Zubr. (Def.'s Mem. at 8–9.) Again, the Court disagrees.

New Jersey's MBPA was enacted on March 1, 2006. N.J. Stat. Ann. § 33:1-93.15 Notably, and as Defendant argues, the statute explicitly provides "[t]his act shall apply to all contracts, agreements and relationships among any brewers and wholesalers, including contracts, agreements or relationships entered into, renewed, extended or modified after the effective date of this act." *Id.* That said, the MBPA also provides that "[c]ontracts, agreements *and relationships* existing prior to the effective date of this act that are *continuing in nature*, have an indefinite term or have no specific duration shall be deemed . . . to have been renewed 60 days after the effective date of this act." *Id*. (emphasis added).

Defendant is correct that that the enactment of the MBPA postdates the 2000 Agreement and any alleged purchase of beer by Plaintiff to distribute in New Jersey. (Def.'s Mem. at 8–9.)

10

That said, Defendant's argument ignores the explicit statutory language that enables retroactive application for contracts, agreements, and relationships, that existed prior to the effective date of the act, but that are continuing in nature. N.J. STAT. ANN. § 33.1-93.15. On the one hand, Plaintiff argues that the complaint alleges that on April 24, 2003, Dojildy (which had been purchased by KP), issued the 2003 Appointment Letter with no specific durational term. (Pl.'s Opp'n. at 9.) Defendant, on the other hand, argues that the 2003 Appointment Letter merely "acknowledges [Plaintiff] as KP's brand agent" and "is not a distribution agreement" extending the exclusive distribution rights granted under the 2000 Agreement. (Def.'s Reply at 4.) Despite Defendant's implication, the Court need not decide the full scope of the 2003 Appointment Letter. The Court is satisfied that, at the very least, the 2003 Appointment Letter is sufficient to establish a relationship that is continuing in nature. Accordingly, the MBPA applies and Defendant's motion to dismiss on this ground fails.

### C. Application of the New York and New Jersey Beer Distributor Statutes

Defendant argues that Plaintiff's claims fail, as a matter of law, because Plaintiff has not alleged any of Defendant's purchases took place in the United States or that title transfer occurred within New York or New Jersey. (Def.'s Mem. at 9–11.) Here, the Court agrees.

New York's ABC, section 55-c(2)(b), defines "brewer" as "any person or entity engaged primarily in business as a brewer, manufacturer of alcoholic beverages, importer, marketer, broker or agent of any of the foregoing who sells or offers to sell beer to a beer wholesaler *in this state* or any successor to a brewer." ABC § 55-c(2)(b) (emphasis added).[5] New Jersey's MBPA

---

[5] Defendant also argues that Plaintiff failed to allege that Defendant is a "brewer" or a "successor to a brewer" and thus subject to the ABC. (Def.'s Mem. at 12–14.) Under the ABC, a brewer is defined in relevant part as "any person or entity engaged primarily in business as a[n] . . . importer . . . who sells or offers to sell beer to a beer wholesaler in this state or any successor to a brewer." *Id.* 2(b). Plaintiff alleges that Defendant "is the importer of various brands of beer . . . including the Zubr brand[.]" (Compl. ¶ 4; *see also id.* ¶¶ 22, 32). At this stage, that allegation is sufficient to plead that Defendant is an importer who sold beer to Plaintiff, a wholesaler; Defendant is thus subject to the ABC. Because the Court finds that Plaintiff has sufficiently alleged Defendant is a brewer under

11

has a similar provision, indicating "[e]very brewer shall contract and agree in writing with a wholesaler for all supply, distribution and sale of the products of the brewer *in this State*, and each contract shall provide and specify the rights and duties of the brewer and the wholesaler with regard to such supply, distribution and sale." N.J. Stat. Ann. § 33:1-93.15 (emphasis added). Based on the language of these statutes, Defendant argues Plaintiff must, and has failed to, plead a sale or offer to sell within New York or New Jersey. (Def.'s Mem. at 10–11.) In response, Plaintiff argues the "in this state" language should only be read as modifying the words "wholesaler" not "sells or offers to sell." (Pl.'s Opp'n at 15.) Or, in other words, only the wholesaler needs to be within New York or New Jersey. (*Id.*)

Ultimately, the crux of the Court's analysis on this issue turns on the interpretation of the language "in this state" under both statues. And here, both parties' analysis heavily references *S.K.I. Beer Corp. v. Baltika Brewery*, a district court opinion within the Eastern District of New York that considered this language within the New York statute as a matter of first impression. 443 F. Supp. 2d 313 (E.D.N.Y. 2006), *aff'd*, 612 F.3d 705 (2d Cir. 2010). In effect, Defendant urges the Court to adopt the reasoning of the *S.K.I. Beer Corp.* court's analysis, while Plaintiff urges the Court to deviate from it. Ultimately, the Court finds the analysis in *S.K.I. Beer Corp.* persuasive and instructive here.

In *S.K.I Beer Corp.*, the court considered a dispute between Baltika Brewery and S.K.I. Beer Corporation, which turned, in part, on the "scope and meaning" of the "in this state" language of New York's ABC, particularly whether the language modified "wholesaler" or "sells or offers to sell." *Id.* at 318–23. There, the court first acknowledged that both interpretations were reasonable. The court noted "[o]ne might reasonably read the phrase 'in this state' as

---

the ABC, it need not consider the parties arguments concerning whether Defendant is also a successor to a brewer under the statute.

12

qualifying 'wholesaler'—and not the type of transaction," which would comport with the rule of the last antecedent, "an interpretive canon which confines the effect of qualifying words and phrases to the word or phrase immediately preceding the qualifier." *Id*. at 318. However, the court also noted "[the contrary] interpretation is also reasonable, because one could, despite the rule of the last antecedent, read the phrase 'in this state' to refer back to the verbal phrase 'sells or offers to sell beer,'" given "the phrasing here simply follows the order of object, indirect object, and place standard to English[.]" *Id*. at 319. Nonetheless, the court recognized statutory construction is a "holistic endeavor," and conducted a fulsome analysis of the statutory language as a whole, the implications of each interpretation, and the legislative history of the statute. *Id*. at 319–21. Based on this analysis, the court determined "it is clear that the phrase 'in this state' refers to the entire phrase preceding it[,]" or in other words, "the New York legislature intended to limit the Statute to sales and deliveries in New York." *Id*. at 320.

Given the *S.K.I. Beer Corp*. court's persuasive and thorough analysis, this Court need not reproduce the same here. That said, the Court notes it finds particularly persuasive the *S.K.I. Beer Corp*. court's concern that Plaintiff's interpretation raises constitutional concerns, namely, the dormant Commerce Clause. *Id*. ("Plaintiff's reading would impose New York's statutory regime for brewer-wholesaler relations on agreements consummated and completed on the other side of the globe simply because the wholesaler was licensed under New York law."). In effect, accepting Plaintiff's argument would mean that any transaction in the world with a licensed New York wholesaler is covered by the New York beer distribution statute. The constitutional concerns apply equally to the New Jersey distributor statute. Against this backdrop, the Court

13

agrees Plaintiff here must plead that Defendant made a sale or offer to sell Zubr in New York or New Jersey, which Plaintiff has not done.[6]

### D. Contractual Claims

Defendant summarily argues that neither of the beer distributor statues apply as the 2000 Agreement is governed by Polish law and the 2000 Agreement expired on its own terms. (Def.'s Mem. at 14–15.) Defendant's arguments in this regard, however, are based on a mischaracterization of the claims brought by Plaintiff—which are not pursuant to the terms of the 2000 Agreement, but rather state statute.

As to the choice of law provision, the parties agreed in the 2000 Agreement that the contract shall be governed by the laws of Poland. (2000 Agreement, Art. 15 ¶ 5.). Plaintiff, however, does not bring a breach of contract claim here. The choice of law provision is thus inapplicable to the present dispute which does not involve any claim for breach of contract. *See, e.g.*, *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 335 (2d Cir. 2005) ("Under New York law . . . tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract . . . ."); *Plymack v. Copley Pharm., Inc.*, No. 93 CIV. 2655, 1995 WL 606272, at *5 (S.D.N.Y. Oct. 12, 1995) ("A contractual choice-of-law provision, however, does not bind the parties with respect to non-contractual causes of action.").

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED in part, and DENIED, in part. Specifically, Defendant's motion to dismiss is GRANTED with respect to

---

[6] In contemplation of the Court reaching this determination, Plaintiff does not argue it has satisfied this pleading standard, but rather, requests leave to amend its pleading in this regard. (Pl.'s Mem. at 11.) Accordingly, Plaintiff's request for leave to amend its pleading is granted.

14

whether Plaintiff pleaded a sale or offer in New York and New Jersey.  Defendant's motion is DENIED with respect to whether Plaintiff's claims are time-barred, whether the claims are expired by the terms of the 2000 Agreement, whether Plaintiff pleaded Defendant is a brewer subject to the ABC, and whether the MPBA applies to Plaintiff's claims concerning distribution in New Jersey.  Further, Plaintiff's motion to amend its complaint is GRANTED.

SO ORDERED.

Dated:  Brooklyn, New York
       March 31, 2022

/s/ LDH
L\ASHANN D\EARCY HALL
United States District Judge